## In re CANUET LUMBER CO.

### (District Court, S. D. Georgia, E. D. March 18, 1910.)

**1. SALES (§ 179*)—BANKRUPTCY (§ 145*)—RECOVERY OF PURCHASE PRICE—DEFENSES—FAILURE OF CONSIDERATION.**

Under the law of Georgia the purchaser of a machine cannot defeat a recovery of the purchase price, on the ground of failure of consideration because of misrepresentations in its sale as to its effectiveness, where such purchaser accepted the machine and used it for several months until adjudged a bankrupt, and in the meantime renewed one of the purchase money notes; nor can its trustee in bankruptcy avail himself of such failure of consideration for any purpose.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 456–468; Dec. Dig. § 179;* Bankruptcy, Dec. Dig. § 145.*]

**2. BANKRUPTCY (§ 140*)—PROPERTY PURCHASED ON CONDITIONAL SALE—RECLAMATION BY SELLER.**

The seller of a machine to a bankrupt under a contract of conditional sale reserving title until payment of the purchase price, which contract was recorded, *held* entitled to reclaim the machine or its proceeds, when sold by the trustee in bankruptcy, without repayment of·the portion of the price paid, where the machine had been used by the purchaser for several months and until it had deteriorated in value more than the amount of such payment.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In the matter of the Canuet Lumber Company, bankrupt. On petition of the Gibbes Machinery Company, intervener, to review order of referee. Order reversed.

A. L. Alexander, for intervener.

Saussy & Saussy, for trustee.

SPEER, District Judge. The Gibbes Machinery Company filed an intervention in this case, in which it was alleged that it had sold to the bankrupts, the Canuet Lumber Company, a 32 horse power traction engine, with attachments; that this was done prior to bankruptcy. It was alleged that the parties had entered into a contract of·conditional purchase and sale; that this contract was duly recorded in Effingham

---
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

county, where the bankrupts resided, and where the traction engine was to be used. It is insisted that under the terms of the conditional contract and agreement all title to the engine was reserved in the vendor, and that the property does not constitute any part of the assets of the bankrupts, and that the trustee in bankruptcy, representing the unsecured creditors, has no property interest therein, except that he may exercise the right of the Canuet Lumber Company, devolving upon him, viz., that he might pay the petitioner the entire balance due on the machinery, and thus acquire title to the engine. It is further alleged that the engine is not worth the balance of the purchase price, and there is no possible equity for the general creditors. The intervener further alleges that the engine and attachments had been sold to the Canuet Lumber Company for the sum of $2,600, $800 of which had been paid in cash, and notes payable quarterly given for the balance. Copies of these notes are attached to the petition. The prayer was that the property be surrendered to him, the intervener.

In his answer the trustee denied the rights set up by the intervener on several grounds. One was that the contract reserving the title to the engine had not been properly witnessed. This the referee disposes of by holding that, since the notes attached to the contract were properly witnessed, this must be regarded as a sufficient attestation of the contract itself, as the notes and contract constituted one instrument. This holding of the referee seems to be justified upon principles of equity, and, besides, nobody excepts to it.

Another ground is that the intervener failed to pay or tender back the $800 which had been received as a part of the purchase money. And the third, which we deem the principal ground, is that the intervener had agreed to furnish a traction engine suitable for hauling logs from the woods to the mill of the bankrupts, and guaranteed that the engine would do the work required; that the purchasers had not only made the cash payment of $800. but had paid freight on the engine, $195.10, and had cut and prepared roads, which it was intended that the traction engine would traverse, at a cost of $200; that the lumber company was at an additional cost of $300 for the loss of labor of a large number of hands, who were compelled to remain in a state of idleness for a period of about two months, during which time the engine was broken down and wholly unable to work. There is an additional charge of $111 for freight on machinery necessary to restore the engine to a state of perfection, which it was guaranteed to possess; and there is an additional claim for $500 damages alleged to have been sustained by reason of the fact that the engine was not properly constructed and was not suitable for the work intended. There is a prayer for the recoupment of all of these sums. No claim is made for the wear and tear upon the temper and nervous system of the officers of the Canuet Lumber Company.

The engine itself, designed by the Canuet Lumber Company to expedite the deforestation of the yellow pines of historic Effingham, is described as:

"One 32 H. P. Reeves traction engine complete. as per catalog, with the following extra parts, to wit: Jacketed boiler; steam jet with hose; low down

pump; special steel tank, with fuel bunker for rear; 12" extension for drive wheel; winding drum or spool."

The learned referee has filed an elaborate opinion, citing the case of Hays v. Jordan, 85 Ga. 743, 11 S. E. 833, 9 L. R. A. 373. He adopts the rule there stated, and quotes it as follows:

"Where, after payment of one of the notes and default in subsequent payment, the vendors bring bail in trover, and elect to take the piano under Code, § 3564, before they can recover it they must return the amount paid them, after deducting· a proper sum for the use of the instrument, if such was of any value to the defendant—such sum, with interest, to be found by the jury from the evidence, and the piano to be returned to the plaintiffs upon payment to the defendant of this sum."

His conclusion is that the vendor should recover his engine, but should pay to the trustee the $800 received as the initial cash payment, less a deduction of a proper amount for the use of the engine, if the use was of any value to the defendant. The referee observes:

"There is not one scintilla of evidence in the case to show what that use was worth, which would enable a court to fix an amount. We regret its absence in the record, as its presence would enable the court to arrive that much nearer to a just and satisfactory finding. But the responsibility of supplying evidence does not rest on the court. It very often has to work on scant material, noticing the meanwhile that fuller. justice could have been arrived at if the evidence had been fuller."

There is no gainsaying these propositions, and they are supported by his recitals from the testimony of Mr. Canuet:

"That on the whole result of his experience with the traction engine he was damaged rather than benefited by its use."

The referee announces that this—

"testimony would be inadmissible in support of any recoupment calling for an affirmative assessment of damages, but may be considered by way of defense in negation of any claim that the use of the engine was remunerative or had any value. It is," he says. "the only evidence on the subject in the record. In the absence of any evidence as to the value of the use of the engine, the court is unable to allow for any."

The referee adds:

"On the whole case we avoid making any decisive finding on the questions of failure of consideration. or recoupment, for the reasons above stated. We find," he continues, "that the intervener is entitled to recover his traction engine, with the extra parts sold, upon payment to the trustee of the sum of $800, without deduction for the use of the engine, and that if the intervener signifies within a reasonable time—which is hereby fixed at 15 days from the date hereof—his unwillingness to pay over to the trustee the said amount and take the engine, the trustee should, by an appropriate order to be hereafter granted, sell the said property at public outcry, and the proceeds of such sale be divided between the intervener and the trustee in the ratio which $2,600 bears to $800. It is accordingly so ordered, adjudged, and decreed."

The traction engine was exposed to sale by order of the learned referee. It brought the sum of $750. This sale was by consent, and the proceeding here, in lieu of the return of the engine, is to obtain an order appropriating the price it brought at the sale to the intervener's claim.

While the intervener has prevailed in his contention before the referee, the result is he has not only lost his engine, but he must pay to the trustee the sum of $230 for the privilege of contending before the referee that he was entitled to payment therefor.

We regret our inability to agree, as we usually do, with these findings of the distinguished and experienced referee. The intervener seeks to recover a traction engine, and he seeks this upon a written contract reserving the title in him until he was fully paid. This claim cannot be defended upon the ground that the evidence is silent as to whether or not the engine was valuable to the lumber company which bought it. This is especially true where the referee declines to pass upon the plea of failure of consideration, which means in this case that there were such fraudulent misrepresentations on the part of the vendor as to the value and effectiveness of its engine as would defeat a recovery of the purchase price agreed upon.

The officers of the Canuet Lumber Company bought this engine with their eyes open, or at least they ought to have been open. If there was an inherent worthlessness in the traction engine, and fraudulent misrepresentations relative thereto, the defense might be good; but the Canuet people were familiar with the roads of the country upon which they purposed to use the engine, and, if they bought an engine unsuitable for their particular work on such terrene as they must traverse, it is their fault, and not the fault of the vendor. The use of the traction engine is well known. They are utilized in portions of Europe to draw trolley cars. They were used by the British in South Africa at times to draw the trains of the army of Lord Roberts. It appears from the evidence in this case that a neighbor to the Canuet Lumber people bought one of these engines and used it to raise logs out of a boom.

It seems that the main objection was it would bog up in muddy places, and would not run well over a sandy road. These objections would probably apply to all ponderous engines. No matter what verbal assurances the canvasser for the sale of this engine may have given to the Canuet Lumber Company, they must be bound by their written contract, unless there was such fraud or mistake in its procurement as would avoid it. It does not appear from the contract that the Gibbes Machinery Company guaranteed that this heavy engine would not bog up in a swamp, or would pull a heavy load through a sand bed. W. B. Canuet, the purchaser, testified that it "would pull an awful load on a good road." He seemed to have little complaint beside its bogging down in low, wet places. He complained that it had "too much power," but admitted that the power could be regulated, and adds:

"It was working up to the time we went into bankruptcy. We were hauling logs with it."

The Canuets took off from the engine a right-hand wheel, which they deemed to be superfluous. This the agent of the machinery company claimed was a balance wheel. The learned referee also quotes from the testimony of Mr. Canuet with regard to a damaging statement on the part of Mr. Ayres. The latter was the agent of the intervener. On a hot July day the engine misbehaved and ran out of the road. Ayres was sent for, and had to get under the engine for the

purpose of adjusting it. The evidence is silent as to whether the fires were withdrawn, or the steam in the boiler discharged; but, be this as it may, while Ayres was under the engine attempting to correct the mischief, he exclaimed to Canuet:

"I do not blame you. I would not have the damn thing either."

This remark of Mr. Ayres, under the circumstances, probably induced the determination of the referee that he would not "find decisively" on the failure of consideration.

"The trustee is affected with every equity which would affect the bankrupt himself, if he was asserting those rights and interests." Isaac on Conditional Sales in Bankruptcy, § 17.

The trustee, then, is met by the fact that the Canuet Lumber Company accepted the engine and used it from the middle of April until June 16, 1907. They renewed the note for the first payment, and used the engine, hauling two truck loads of logs at a time, up to the time they went into voluntary bankruptcy in August.

The rule upon this subject is fixed by the Supreme Court of Georgia in Lunsford v. Malsby & Avery, 101 Ga. 39, 28 S. E. 496, as follows:

"The plea of failure of consideration, in so far as it rested upon the alleged unsuitableness of the machine for the purpose for which it was intended, because of certain defects existing therein, could not avail the defendants under the evidence in the case. The notes were not signed by the defendants until after they had examined the machine and tested it with the aid of the agent of the plaintiffs. It is true that, after examining the machine and thoroughly testing it, the defendants came to the conclusion that it would not perform the service that it had been represented it would perform—that is, grind cotton seed at the rate of 50 to 75 bushels per hour, and of such fineness that the product could be used for a fertilizer. In the case of Harder v. Carter, 97 Ga. 273 [23 S. E. 82], which is analogous to this branch of the present case, it was held that: 'Even if the machinery for the agreed price of which the action was brought was in fact defective or worthless, yet as the defendant, after the most complete and ample opportunity for trying and testing it, and with full knowledge of its character and of all its alleged defects, deliberately promised in writing to pay for it, he could not thereafter set up in resistance to such action the defense of failure of consideration predicated upon alleged defectiveness or worthlessness of the machinery.' See, also, the case of American Car Company v. Atlanta Street Railway Company, 100 Ga. 254 [28 S. E. 40]."

The case of Hays v. Jordan, 85 Ga. 743, 11 S. E. 833, 9 L. R. A. 373, relied upon by the referee, does not seem to be as clearly in point as Lunsford v. Malsby & Avery, supra. The machine in Hays v. Jordan was a piano. The difference between a piano and a traction engine is perhaps distinguishable. A piano is not ordinarily subject to rapid deterioration. It may be otherwise if the performer is a person of great vigor, and attempts to render such compositions as the "Battle of Prague" of May 6, 1757, and of which Carlyle declared it "sounded through all the world, and used to deafen us in drawing rooms within man's memory." Of course it would be unjust to allow the seller to take a piano, in good condition, after receiving a large part of the purchase price, and give no account for the amount received. An ordinary piano, we believe, is not worth as much as this traction engine, the price of which was $2,600. A clause in the contract stipulated:

"It is further agreed that the said parties of the second part shall keep the property above described in good condition and repair, and shall not do or suffer any act to be done whereby the value of the same as security for the debt shall be impaired or weakened."

How well they complied with this agreement may be inferred from the fact that they dispensed with a portion of the machinery, and that after six months' use it was sold at public outcry for only $750. We think the burden would be on the Canuet Lumber Company to show that they kept it in repair, and the degree of value which had been maintained in the adjustment of any equities between them and the vendor. While there were doubtless accidents in the use of this engine, and while this was unavoidable, it is plain enough that it must have been of much value to the Canuets. One of them testified that his engineer was an "Irishman, and," he continued, "I was right behind him. I was punching him for all he could get out of it. He was there for that purpose."

For these reasons, we are compelled to differ with the learned referee, and we conclude that the Gibbes Machinery Company has fully established its title to the values representing this engine in the hands of the trustee, and an order may be taken directing that the sum realized from the sale of the machinery in controversy be paid to the intervener, and that the trustee pay the costs of this proceeding.